# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KEITH ALLEN BAGLEY,

        Defendant-Appellant.

UNPUBLISHED
April 21, 2015

Nos. 318874; 322746; 322828
Newaygo Circuit Court
LC Nos. 12-010152-FH;
          12-010153-FC

Before: METER, P.J., and SAWYER and BOONSTRA, JJ.

PER CURIAM.

In Lower Court No. 12-010152-FH, defendant was charged with three counts of second-degree criminal sexual conduct (CSC II), MCL 750.520c(1)(a). The victim was HB, defendant's daughter. In Lower Court No. 12-010153-FC, defendant was charged with one count each of first-degree criminal sexual conduct (CSC I), MCL 750.520b(1)(d)(*ii*); CSC II, MCL 750.520c(1)(a); and fourth-degree criminal sexual conduct (CSC IV), MCL 750.520e(1)(d). The victim was KM, who was also defendant's daughter. The two cases were consolidated and, following a jury trial at which defendant represented himself, defendant was convicted of the six charges. In Lower Court No. 12-010152-FH, the trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to six years to 22 years and six months' imprisonment for each of the CSC II convictions. In Lower Court No. 12-101053-FC, the trial court sentenced defendant as a second-offense habitual offender to prison terms of 18 to 75 years on the CSC I conviction, six years to 22 years and six months on the CSC II conviction, and two to three years on the CSC IV conviction. After defendant moved for resentencing and the trial court held that the sentencing guidelines, in part, were incorrectly scored, the trial court resentenced defendant to the same sentences. In Docket No. 318874, defendant appeals by right from his convictions. In Docket Nos. 322746 and 322828, defendant appeals by right from the sentences imposed on resentencing. We affirm in all docket numbers.

-1-

I. PERTINENT FACTS AND PROCEDURAL HISTORY

In December 2010, Marlene Engman, who was in a romantic relationship with defendant, moved into defendant's Newaygo home. Defendant's daughter, HB, and her sister[1] also lived in the home. KM, who is also defendant's daughter, and her son moved into the home in February 2011. The following month, Michael Middleton and his daughter moved into the home. At the time, KM and Middleton were dating. They married in August 2012.

Engman testified that she and defendant engaged in "threesomes" with other women. According to Engman, defendant talked about KM in a sexual manner "quite a bit." He said that he wanted to have a sexual relationship with KM. Engman had seen defendant grab KM's breasts and buttocks on multiple occasions. Engman also testified that on one occasion HB lifted her shirt and asked defendant how her breasts were doing. Defendant felt her breasts and said they were getting there.

HB, who was 13 years old at the time of trial, testified that defendant touched her breasts and buttocks when she was younger than 13 years of age. HB described four times when defendant touched her buttocks, and testified that defendant often told her that her buttocks were nice when he touched them. HB also described several times when defendant touched her breasts. HB testified that there were several times when defendant dumped a bucket of ice water on her while she was taking a shower. Defendant would open the shower curtain and watch her freeze.

KM, who was 19 years old at trial, testified that defendant and her mother separated about a year after she was born. She then lived with her mother. KM occasionally saw defendant every other weekend. She testified that defendant's treatment of her was "decent" until he started touching her buttocks and breasts. The touching started when KM was under the age of 13 and happened frequently. KM believed the touching was intentional, not accidental. Defendant laughed and joked when he did it, but the touching was not playful tickling.

KM testified that she moved into defendant's house after her son was born because she thought defendant had changed and she needed a stable home for her son. KM testified that after she moved in she occasionally saw defendant touch HB's buttocks.

Things soon got "awkward" for KM with defendant and Engman. Defendant and Engman did not hide the fact that they went on "picnics," or had threesomes, with women they met over the Internet. Both commented to KM that they would like to have sex with her and that they would pay her. The idea disgusted KM and she told defendant and Engman that she would never do it. KM continued to stay at defendant's house because she never thought defendant and Engman would act on their request.

Defendant hosted parties at his house, where there would be alcohol and drugs. There was a party at the end of May or the beginning of June 2011. Defendant, Engman, KM, and

---

[1] The record is unclear whether HB's sister is also defendant's daughter.

Middleton were at the party, as were Jake Kruger, Steven Lisee, and Thomas Kropewnicki. Others may have been there too. There was drinking at the party; both KM and Middleton admitted that they were drunk. Engman had purchased the alcohol, although Middleton and defendant had split the cost of a bottle of liquor. KM testified that she exposed her breasts when she was in the kitchen with Middleton, defendant and Engman, and that the exposure was intended for Middleton, not anyone else. Defendant did not touch KM, but he took a picture of her breasts with his phone. KM was unsure whether anyone else was in the kitchen. Middleton believed that everyone who was at the party was in the kitchen when the exposure happened. He also believed, but could not say for certain, that defendant took a picture of KM. HB testified that she was at the party. Defendant let her drink alcohol and hang out with everyone. After she used the bathroom, she saw KM turn around and put her shirt back on.

KM testified that, after defendant and Engman went to their bedroom, Engman called her to the room. She and defendant wanted to talk to KM. After KM sat on the edge of the bed, defendant came and held her down. He put one hand on her leg and his other hand on her shoulder. He pushed KM back onto the bed. Engman held KM's other shoulder down. KM tried to get away. She struggled, but defendant was much bigger than she was. Defendant pulled down the front of KM's pants and touched the inside of her vagina with his hand. He told Engman to "try this." Engman leaned over and put her mouth on KM's vagina. Defendant and Engman then let KM leave the bedroom. KM did not tell Middleton what had happened. She testified that she knew that Middleton, if he knew what had happened, would confront defendant and that defendant would throw them out of the house. They had no other place to live.

Engman testified that she went into the bathroom sometime after KM exposed herself. When she left the bathroom, she saw defendant and KM in the bedroom. She went into the room and sat on the bed. She testified that defendant and KM wanted Engman to lick KM's private parts. Defendant undid KM's pants. He grabbed Engman's head and pushed Engman toward KM's vagina. Engman moved her head, stood up, and walked out of the bedroom. Engman was experiencing memory problems; she suffers from grand mal seizures. She could not recall whether she saw defendant touch KM's vagina, although she knew that defendant's hands were "pretty close."

Middleton testified that he and KM retired to their bedroom when the party tapered and went to bed. But he remembered that, at some point in the evening, Engman called KM to the bedroom that Engman shared with defendant. After that night, Middleton soon noticed that KM was "a little more standoffish" and that she did not want to be at defendant's house. It was always Middleton and KM's plan to get their own place, but after the party, KM showed increased urgency for finding a new place to live. Within three weeks of the party, four weeks at most, KM and Middleton moved out of defendant's home and into an apartment.

In January 2012, defendant made Engman move out of the house. Subsequently, Engman wanted to get her belongings out of the home. She requested that a police officer accompany her because she knew that defendant would be irate. A City of Newaygo Police Officer, Noah Farrant, accompanied Engman. Defendant refused to let Engman into the house. The two started yelling at each other. Engman told Farrant of concerns she had that defendant had sexually touched his daughters. She also said there were "pictures" on defendant's telephone and computer. Defendant denied Engman's allegations. Farrant asked defendant for KM's

-3-

contact information. Instead of providing the requested information, defendant called KM on the telephone. Defendant then gave the telephone to Farrant. Farrant asked her about Engman's allegation that defendant had touched her sexually; KM denied the allegation. According to Farrant, KM's denial was "a passive no." KM later testified that she had denied the allegations because the telephone call was unexpected and she did not know what to do.

Soon thereafter, City of Newaygo Police Officer Mike Goff and Children's Protective Services investigator Jennifer Arnold, interviewed HB at the Newaygo Middle School. They informed HB that they wanted to talk to her about parties at defendant's house. The only allegation of which they were aware was that KM had taken her top off at a party and that HB had witnessed this act. The interview was brief. HB was scared and started crying soon after the interview began. She said that she was not allowed to talk to them without defendant's permission. HB did not make any disclosures about defendant. In fact, she said that she was not aware of any bad touches that happened at defendant's house. However, she indicated that she wanted to talk more to Goff and Arnold in the future.

HB testified that, after Engman called the police on defendant, defendant told her not to talk to the police without him there or without his permission. She did not tell Goff and Arnold anything about defendant because she was scared that defendant would beat her. Defendant had previously hit her and screamed at her.

Goff also interviewed KM. KM admitted that she had exposed herself at the party, and she made other disclosures about defendant. According to KM, she told Goff "mostly everything." However, she did not tell him about what had happened with defendant and Engman in the bedroom because she was ashamed. The same day, Goff and Arnold returned to Newaygo Middle School to speak with HB. HB was more relaxed, and she made disclosures about defendant. HB testified that it was not easy telling the truth to Goff and Arnold and that she did not tell them everything because she was still a little scared.

The following day, KM called Goff because she wanted to be reinterviewed. She brought HB to the police station with her. In her interview, KM disclosed what had happened the night of the party. In her interview, HB was "very willing" to talk and she gave more details about being touched by defendant and how often the touches occurred. Both KM and HB testified that they had not talked with each other about what defendant had done to them.

On January 25, 2012, five days after Farrant accompanied Engman to defendant's house, City of Newaygo Police Officer Lloyd Walerczyk executed search warrants for defendant's computer and cellular telephone. There had been reports of indecent pictures on them. Numerous pictures of defendant's family members and pets were found on his cellular telephone. Numerous pornographic images of nude women were found on defendant's computer. All the women in the pictures appeared to be at least 18 years old.

Kruger, Lisee, and Kropewnicki were called as defense witnesses. Kruger, who was 21 years old at the time of trial, did not recall KM exposing herself at the party. He was "pretty heavily" intoxicated and does not remember most of the night, although he remembered sitting on the porch with defendant. Lisee, who was 20 years old at trial, did not see KM expose herself. He, too, was drunk at the party. Kropewnicki, who was 23 years old at trial, testified

that when he and KM were alone in the kitchen during the party, KM asked him if he wanted to see her breasts. Before he could respond, KM took off her shirt, exposing herself. Defendant was in a different room. Middleton came into the kitchen, saw KM's breasts, and paid no mind to what was happening. Kropewnicki also testified that he witnessed KM and Engman engaging in consensual sexual activity at the party. He admitted that he had talked to a police officer in July 2012 and did not tell the officer about anything to which he testified. Lisee did not see HB at the party, but it was his understanding that HB was in her bedroom. According to Kruger and Kropewnicki, HB was not at defendant's house and the party happened because HB was not there.

Defendant's mother testified that everything seemed fine whenever she visited defendant's house. She never saw defendant be mean to HB. She testified that HB was at her house the night of the party.

Following deliberations, the jury convicted defendant of three counts of CSC II in Lower Court No. 12-010152-FH (involving HB) and of CSC I, CSC II, and CSC IV in Lower Court No. 12-010153-FC (involving KM). The trial court sentenced defendant as described above. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that his convictions are not supported by sufficient evidence. We disagree. We review de novo challenges to the sufficiency of the evidence. *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). We view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the prosecution proved the elements of the crime beyond a reasonable doubt. *Id*. The testimony of a CSC victim need not be corroborated in order for a CSC conviction to stand. MCL 750.520h.

Defendant's argument that his convictions are not supported by sufficient evidence because HB and KM, as well as Engman, his ex-girlfriend, were not credible witnesses is without merit. The credibility of witnesses and the weight to be accorded evidence are questions for the jury. *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009). By convicting defendant of the CSC charges, the jury necessarily found the prosecution's witnesses credible. We will not interfere with the jury's credibility determinations. *People v Noble*, 238 Mich App 647, 657; 608 NW2d 123 (1999).

To convict a defendant of CSC II under MCL 750.520c(1)(a), the prosecutor must prove that the defendant engaged in sexual contact with another person and the other person was under 13 years of age. "Sexual contact" is defined as "the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can *reasonably be construed* as being for the purpose of sexual arousal or gratification, [or] done for a sexual purpose . . . ." MCL 750.520a(q) (emphasis added). This definition incorporates a reasonable person standard. *People v Piper*, 223 Mich App 642, 647; 567 NW2d 483 (1997). Consequently, a jury need only determine whether the charged conduct, when viewed objectively, could reasonably be construed as being for a sexual purpose. *Id*. HB testified that when she was under the age of 13, defendant touched her buttocks and breasts several times. Engman also testified that she had seen

defendant touch HB inappropriately. She also testified that defendant had said he was unsure whether he would be able to control himself with HB. Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant intentionally touched HB's intimate parts or the clothing covering those parts when HB was under the age of 13 and that the contact, reasonably construed, was for a sexual purpose. *Cline*, 276 Mich App at 642. Defendant's convictions for CSC II in Lower Court No. 12-010152-FH are supported by sufficient evidence.

KM testified that defendant started to touch her buttocks and breasts when she was 11 years old. He did so on at least 10 occasions. Defendant would tell KM that she had a nice butt or that she had a nice "ghetto booty." Viewing KM's testimony in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant intentionally touched KM's intimate parts or the clothing covering her intimate parts when she was under the age of 13 and that the contact could reasonably be construed as being for a sexual purpose. *Id*. Sufficient evidence supports defendant's conviction for CSC II in Lower Court No. 12-010153-FC.

To convict a defendant of CSC I under MCL 750.520b(1)(d)(*ii*), a prosecutor must prove that the defendant engaged in sexual penetration with the victim and that the defendant was aided and abetted by another person and used force or coercion to accomplish the sexual penetration. Force or coercion includes when the defendant overcomes the victim through the application of physical force or violence. MCL 750.520b(1)(d)(*ii*), (f)(*i*). The victim need not resist. MCL 750.520i. "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." MCL 750.520a(r). KM testified that, after Engman called her to defendant's bedroom on the night of a party where she had exposed her breasts, she sat on the bed, and defendant held her down and pushed her back onto it. Defendant had one hand on her leg and the other hand on her shoulder. KM struggled and tried to get away, but defendant was much bigger than she and Engman held her other shoulder down. Defendant pulled down the front of KM's pants and touched the inside of her vagina with his hand. Viewing KM's testimony in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant engaged in sexual penetration with KM and that he was aided and abetted by another person and used force or coercion to accomplish the penetration. *Cline*, 276 Mich App at 642. Defendant's conviction for CSC I in Lower Court No. 12-010153-FC is supported by sufficient evidence.

Regarding defendant's CSC IV conviction, defendant was charged with CSC IV under MCL 750.520e(1)(d) (engaging in sexual contact with a person who is related by blood or affinity to the third degree). The jury was thus required to find that defendant engaged in sexual contact with KM and that KM was related to him by blood or affinity to the third degree. *Id*. The jury heard evidence that defendant pulled down her pants and touched her vagina the night of the party. It is also undisputed that defendant was KM's father and thus related to her to the first degree. See *People v Russell*, 266 Mich App 307, 310-311; 703 NW2d 107 (2005). Thus,

-6-

taking the evidence in the light most favorable to the prosecution, defendant's conviction for CSC IV in Lower Court No. 12-010153-FC is supported by sufficient evidence.[2]

## III. OTHER ACTS EVIDENCE

Defendant argues that the trial court erred when it allowed the jury to hear evidence of his prior sexual acts with HB and KM, evidence that he had parties at his house where alcohol was served to minors and marijuana was smoked, and evidence that he had pornography on his computer. Because defendant did not object to any of the challenged evidence below, the issues are unpreserved. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). We review unpreserved claims of evidentiary error for plain error affecting defendant's substantial rights. *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011). Plain error, which is error that is obvious or clear, affects a defendant's substantial rights when it affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Defendant does not specify what constitutes the evidence of his prior sexual acts with HB and KM. We assume that, because HB and KM testified to more touchings by defendant of their breasts and buttocks than were charged, defendant is referring to the touchings that were not the basis for the CSC II charges. However, the CSC II charges were never tied to any specific touchings. Alternative acts committed by the defendant may be presented as evidence of the actus reus of the charged offense. *People v Cooks*, 446 Mich 503, 524; 521 NW2d 275 (1994). Therefore, there was no evidence of other sexual acts committed by defendant against HB and KM. Defendant's numerous touchings were evidence of alternative acts comprising the actus reus of the CSC II offenses. *Id.* Each touching, in essence, was a charged act.

Regardless, evidence of any sexual act by defendant against HB and KM was admissible under MCL 768.27a. Indeed, this is not disputed by defendant. Rather, defendant claims the evidence was inadmissible because (1) if MCL 768.27a allows evidence of a defendant's other acts to be used to show a propensity to commit crimes, the statute violates due process; (2) the evidence was unfairly prejudicial under MRE 403; and (3) the prosecutor failed to give notice of his intent to offer the evidence. These arguments are without merit. First, evidence admissible under MCL 768.27a may be used to show the defendant's character and propensity to commit the charged crime. *People v Watkins*, 491 Mich 450, 470; 818 NW2d 296 (2012). Because MCL 768.27a is subject to MRE 403, *id.* at 486, the statute does not violate due process. See

---

[2] It appears from this Court's review of the trial court's instructions to the jury that the jury was instructed, regarding the charge of CSC IV, that it was to find defendant guilty of CSC if (1) defendant touched KM's buttocks or breast or the clothing covering those areas; (2) the touching was done for a sexual purpose or could reasonably be construed to have been for a sexual purpose; and (3) defendant used force or coercion to commit the sexual act. Thus, it appears that the jury was not instructed regarding its need to find that defendant was related to KM. However, the jury did hear undisputed evidence at trial that KM was defendant's daughter; further, defendant expressed approval of the jury instructions, waiving any error, as discussed in Part IV, infra. We therefore conclude that any instructional error was harmless and does not affect our analysis of the sufficiency of the evidence supporting defendant's convictions.

-7-

*United States v LeMay*, 260 F3d 1018, 1024-1027 (CA 9, 2001); *United States v Castillo*, 140 F3d 874, 880-883 (CA 10, 1998).[3]  Second, under MRE 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  But, when applying MRE 403 to evidence admissible under MCL 768.27a, courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect. *Watkins*, 491 Mich at 487.  Here, the evidence was highly probative because it showed a pattern of conduct by defendant, and because it supported the credibility of HB and KM.  See *id*. at 491. The evidence was thus not inadmissible under MRE 403.  Third, MCL 768.27a contains a notice requirement; if a prosecutor intends to offer evidence under MCL 768.27a, he must disclose the evidence at least 15 days before trial.  At the preliminary examination, the prosecutor elicited evidence of touchings by defendant of HB and KM's breasts and buttocks that was beyond the number needed to bind defendant over on three charges of CSC II in Lower Court No. 12-010152-FH and on one charge of CSC II in Lower Court No. 12-010153-FC.  Hearing the preliminary examination testimony, defendant was on notice that the prosecutor intended to introduce evidence of his other sexual acts at trial.  We find no plain error in the admission of any evidence of sexual acts by defendant against HB and KM.

However, we do conclude that admission of evidence regarding earlier parties[4] at defendant's house where underage people drank alcohol and smoked marijuana, was plainly erroneous, *Benton*, 294 Mich App at 202, because it was not offered for a purpose other than to establish defendant's character or propensity to commit the charged offenses, MRE 404(b)(1), *People v Magyar*, 250 Mich App 408, 414; 648 NW2d 215 (2002).  We also conclude that admission of evidence that adult pornography was found on defendant's computer was plainly erroneous, *Benton*, 294 Mich App at 202, because, although it was minimally relevant to Engman's credibility (since Engman had testified that defendant looked at pornography on the computer before he discussed engaging in threesomes with her), the probative value of the evidence was outweighed by the danger of unfair prejudice, MRE 403; *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001).  However, this plain error did not affect defendant's substantial rights.  *Benton*, 294 Mich App at 202.  Based on the testimony of HB and KM about defendant's acts, as well as Engman's testimony that defendant said he wanted to have a sexual relationship with KM and he did not know if he would be able to control himself with HB, the evidence showed that defendant had a propensity to engage in sexual acts with his daughters and

---

[3] These cases hold that FRE 414, the federal counterpart of MCL 768.27a, *Watkins*, 491 Mich at 471, does not violate due process because it remains subject to FRE 403.  Although decisions of lower federal courts are not binding on this Court, *People v Chowdhury*, 285 Mich App 509, 516; 775 NW2d 845 (2009), we view these cases as persuasive.

[4] There was no plain error in the admission of evidence that on the night of the party where KM exposed herself, underage people drank alcohol and smoked marijuana at defendant's house. This evidence fells under the "res gestae" exception to MRE 404(b).  See *People v Sholl*, 453 Mich 730, 742; 556 NW2d 851 (1996); *People v Robinson*, 128 Mich App 338, 340; 340 NW2d 303 (1983).

had a pattern of conduct. The evidence of earlier parties and possession of pornography did not affect the outcome of defendant's trial. *Carines*, 460 Mich at 763.[5]

## IV. INSTRUCTIONAL ERRORS

Defendant next argues that the trial court erred because it did not give an accomplice instruction regarding Engman. He also argues that the trial court erred when it instructed the jury that it could use evidence of uncharged acts in deciding whether defendant committed the charged acts. After the trial court instructed the jury, defendant stated that he was satisfied with the instructions. Because defendant expressly approved the instructions, he waived these claims of instructional error. See *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011); *People v Lueth*, 253 Mich App 670, 688; 660 NW2d 322 (2002).

Further, there was no plain error in the trial court's instructions. This Court has recognized that an accomplice might have a special interest in testifying, thereby raising questions about the accomplice's credibility. *People v Heikkinen*, 250 Mich App 322, 327; 646 NW2d 190 (2002). Here, however, the prosecution presented evidence of defendant's guilt of the CSC I charge beyond the testimony of Engman. He presented KM's testimony. In fact, Engman's testimony did not support the prosecution's contention that defendant had committed CSC I, because she denied participating in any sexual penetration of KM. Further, the jury was instructed that in determining witness credibility they should consider whether the witnesses have any bias, prejudice, or personal interest in how the case is decided and whether the witnesses have any special reason to tell the truth or to lie. Under these circumstances, a cautionary accomplice instruction was not clearly and obviously required. *Young*, 472 Mich at 143; *Carines*, 460 Mich at 763. And the jury was properly allowed to consider evidence of defendant's prior sexual acts against his daughters for propensity purposes. MCL 768.27a.

## V. SENTENCING GUIDELINES

Defendant next argues that the trial court erred in assessing points for offense variables (OVs) 4, 10, and 14, because any facts used to score them were not found beyond a reasonable doubt by a jury, in contravention of case law from the United States Supreme Court, including *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), and *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013). Our Supreme Court has

---

[5] Defendant also raised other allegations of evidentiary error. Defendant argues that the trial court erred when it prevented him from asking KM about her allegation of having been raped by her mother's ex-boyfriend. He also argues that the trial court erred when it prevented him from introducing a video recording of an interview where the police purportedly said that they had to make it look like a scorned ex-girlfriend was not trying to get revenge. However, because defendant has not cited any authority in support of these claims of error, the claims are abandoned. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

held that *Apprendi* does not apply to Michigan's sentencing guidelines, *People v Drohan*, 475 Mich 140, 164; 715 NW2d 778 (2006), while this Court has held that *Alleyne* does not apply to the sentencing guidelines, *People v Herron*, 303 Mich App 392, 405; 845 NW2d 533 (2013), application for lv to appeal held in abeyance ___ Mich ___; 846 NW2d 924 (2014). We are bound to follow these decisions. MCR 7.215(J)(1); *Charles A Murray Trust v Futrell*, 303 Mich App 28, 48; 840 NW2d 775 (2013). Defendant's argument is without merit.

Defendant also argues that the trial court erred in scoring OVs 4, 10, and 14 because any facts used to score them were not proved by a preponderance of the evidence. A trial court's factual determinations made in scoring the sentencing guidelines are reviewed for clear error and the determinations must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Clear error exists when this Court is left with a definite and firm conviction that a mistake was made. *People v Brooks*, 304 Mich App 318, 319-320; 848 NW2d 161 (2014).

The trial court assessed 10 points for OV 4, which addresses psychological injury to a victim, MCL 777.34(1), in Lower Court No. 12-010152-FH and in Lower Court No. 12-010153-FC. Ten points may be assessed for OV 4 if "[s]erious psychological injury requiring professional treatment occurred." MCL 777.34(1)(a). A trial court properly assesses 10 points for OV 4 if the serious psychological injury may require professional treatment. MCL 777.34(2). The fact that the victim did not seek professional treatment is not conclusive. *Id.*; *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012).[6]

In Lower Court No. 12-010152-FH, HB's mother submitted a victim impact statement, in which she wrote that HB was sexually molested by defendant, her biological father, and that HB receives counseling as a result. In *People v Davenport* (*After Remand*), 286 Mich App 191, 200; 779 NW2d 257 (2009), this Court held that the trial court properly assessed 10 points for OV 4 where there was evidence that the victim went to counseling. Because there was evidence that HB went to counseling as a result of being sexually abused by defendant, the trial court's assessment of 10 points for OV 4 in Lower Court No. 12-010152-FH was not clearly erroneous. *Hardy*, 494 Mich at 438.

In her victim impact statement, KM wrote, "This has been very hard on me because he is my father." KM testified she was "ashamed" about what happened in the bedroom because defendant was her dad and she was left with the question, "why would anyone do something like that to their daughter." At trial, KM cried as she recalled what had happened in the bedroom. In *People v Williams*, 298 Mich App 121, 124; 825 NW2d 671 (2012), this Court upheld an assessment of 10 points for OV 4 when the victim wrote in his impact statement that the home invasion committed by the defendant left him feeling angry, hurt, violated, and frightened.

---

[6] We reject defendant's argument that the rule of lenity requires that zero points be assessed for OV 4. "The 'rule of lenity,' which provides that courts should mitigate punishment when the punishment in a criminal statute is unclear," only applies when the statute's language is ambiguous or in the absence of any firm indication of legislative intent. *People v Denio*, 454 Mich 691, 699, 700 n 12; 564 NW2d 13 (1997). The language of OV 4 is not ambiguous.

Based on KM's statements, as well has her crying at trial, the trial court's assessment of 10 points for OV 4 in Lower Court No. 12-010153-FC was not clearly erroneous. *Hardy*, 494 Mich at 438.

The trial court assessed 10 points for OV 10, which addresses exploitation of a vulnerable victim, MCL 777.40(1), in Lower Court No. 12-010152-FH and in Lower Court No. 12-010153-FC. Ten points may be assessed for OV 10 if "[t]he offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status." MCL 777.40(1)(b). To "exploit" means "to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). A "domestic relationship" is a familial or cohabitating relationship. *People v Jamison*, 292 Mich App 440, 446; 807 NW2d 427 (2011).

There was a domestic relationship between HB and defendant. Defendant was HB's father, and HB, who was 13 years old at trial, lived with him. HB testified that defendant did not let her see or talk to her mom. HB's mother testified that, before HB disclosed defendant's abuse, she had not seen HB since 2009 because defendant would not let her see HB. Defendant was more than 30 years older than HB. These facts support a finding, under a preponderance of the evidence standard, that HB was vulnerable, either because of her youth or her domestic relationship with defendant, and that defendant manipulated HB for a selfish or unethical purpose. *Hardy*, 494 Mich at 438. The trial court's assessment of 10 points for OV 10 in Lower Court No. 12-010152-FH was not clearly erroneous. *People v Phillips*, 251 Mich App 100, 109; 649 NW2d 407 (2002).

KM was also young. She was 17 years old at the time of the party, and was about 25 years younger than defendant. KM had a familial relationship with defendant—he was her dad—and she lived in his house. KM, who was not working and who had a very young son, testified that she had no other place to live. These facts support a finding, under a preponderance of the evidence standard, that KM was vulnerable, either because of her youth or her domestic relationship with defendant, and that defendant exploited these vulnerabilities when Engman called KM into the bedroom. *Id*. The trial court's assessment of 10 points for OV 10 in Lower Court No. 12-010153-FC was not clearly erroneous. *Id*.

Finally, the trial court assessed 10 points for OV 14, which addresses the offender's role, MCL 777.44(1), in Lower Court No. 12-010153-FC. Ten points may be assessed for OV 14 if "[t]he offender was a leader in a multiple offender situation." MCL 777.44(1)(a). The entire criminal transaction is to be considered. MCL 777.44(2)(a). A "leader" is a person "who is a guiding or directing head of a group." *People v Jones*, 299 Mich App 284, 287; 829 NW2d 350 (2013), vacated in part on other grounds 494 Mich 880 (2013) (quotation omitted). A person leads by guiding, preceding, showing the way, directing, or conducting. *People v Rhodes*, 305 Mich App 85, 90; 849 NW2d 417 (2014). KM testified that Engman called her into the bedroom. Despite this fact, the trial court's finding that defendant was a leader was not clearly erroneous. *Hardy*, 494 Mich at 438. After KM sat on the bed, defendant held her down. Putting one hand on her leg and his other hand on her shoulder, he pushed KM back onto the bed. Defendant pulled down KM's pants and penetrated her vagina. He then told Engman to "try this," and Engman put her mouth on KM's vagina. Based on this evidence, which showed that defendant was the first to have physical and sexual contact with KM and that he gave direction to

-11-

Engman, we are not left with a definite and firm conviction that the trial court made a mistake in assessing 10 points for OV 14. *Brooks*, 304 Mich App at 319-320.

## VI. PROPORTIONALITY

Defendant argues that the trial court violated the principal of proportionality when, at resentencing, and despite a reduction in the recommended minimum sentence ranges after the trial court rescored prior record variable 6 and OV 10 in his favor, it imposed the same sentences that it had originally imposed. There is no dispute that defendant's sentences fall within the recalculated recommended minimum sentence ranges under the legislative guidelines. Therefore, pursuant to MCL 769.34(10), because there are no errors in scoring the guidelines, we are required to affirm defendant's sentences. *People v Armisted*, 295 Mich App 32, 51-52; 811 NW2d 47 (2011).

## VII. DEFENDANT'S STANDARD 4 BRIEF

Defendant raises numerous additionally allegations of error in his Standard 4[7] brief.

## A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that he was denied effective assistance of counsel because defense counsel failed to move for bills of particulars and to separate the charges for trial. To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below objective standards of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceedings would have been different. *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008). Because defendant did not move for a new trial or a *Ginther*[8] hearing, our review of these claims is limited to mistakes apparent on the record. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

Defendant represented himself at varying times during pretrial proceedings, with his trial counsel available as standby counsel. "A defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." *People v Kevorkian*, 248 Mich App 373, 419; 639 NW2d 291 (2001). The applicable court rules, MCR 6.112 and MCR 6.120, contain no time requirement for motions requesting a bill of particulars or a severance of charges. Because defendant, when he represented himself, had the opportunity to move for bills of particulars and for a severance of the charges but did not make the motions, defendant cannot show that he was prejudiced by defense counsel's inaction.

---

[7] A Standard 4 brief is a supplemental pro se brief that may be filed by a criminal defendant pursuant to Michigan Supreme Court Administrative Order 2004-6.

[8] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Regardless, any inaction by defense counsel did not deny defendant the effective assistance of counsel. First, because defendant had a preliminary examination, any motion for bills of particulars would have been futile. *People v Harbour*, 76 Mich App 552, 557; 257 NW2d 165 (1977). Counsel is not ineffective for failing to make a futile motion. *People v Horn*, 279 Mich App 31, 42 n 5; 755 NW2d 212 (2008). Second, even assuming, but without deciding, that the charges were not related and, therefore, that the trial court would have been required to sever the charges for trial had a motion for severance been made, see MCR 6.120(C), it is not reasonably probable that any such severance would have affected the outcome. Because all of defendant's sexual acts against HB and KM constituted listed offenses against a minor, MCL 768.27a, evidence of all of defendant's sexual acts against HB and KM would have been admissible in a trial on any of the CSC charges, on any matter to which the evidence was relevant, including defendant's character and propensity to commit the charged crime. *Watkins*, 491 Mich at 470. Thus, each jury would have heard the same evidence, and defendant cannot show that, but for defense counsel's inaction, the result of the proceedings would have been different. *Uphaus* (*On Remand*), 278 Mich App at 185.

## B. REASONABLE NOTICE OF CSC II CHARGES

Defendant next argues that he was denied his right to reasonable notice of the CSC II charges against him. Because defendant did not raise this issue below, it is unpreserved, *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007), and reviewed for plain error affecting substantial rights, *Carines*, 460 Mich at 763.

"A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence[.]" *In re Oliver*, 333 US 257, 273; 68 S Ct 499; 92 L Ed 682 (1948). "A defendant's right to adequate notice of the charges against the defendant stems from the Sixth Amendment, as applied to the states through the Due Process Clause of the Fourteenth Amendment." *People v Darden*, 230 Mich App 597, 600; 585 NW2d 27 (1998). A prosecution must be based on an information or an indictment. MCR 6.112(B). "To the extent possible, the information should specify the time and place of the alleged offense." MCR 6.112(D). In determining whether the failure to pinpoint the date of the offense denied a defendant due process of law, this Court considers four factors: "(1) the nature of the crime charged; (2) the victim's ability to specify a date; (3) the prosecutor's efforts to pinpoint a date; and (4) the prejudice to the defendant in preparing a defense." *People v Sabin*, 223 Mich App 530, 532; 566 NW2d 677 (1997), remanded in part on other grounds 459 Mich 924 (1998) (quotation omitted). "Where the facts demonstrate that the prosecutor has stated the date and time of the offense to the best of his or her knowledge after undertaking a reasonably thorough investigation, [this Court] would be disinclined to hold that an information . . . was deficient for failure to pinpoint a specific date." *People v Naugle*, 152 Mich App 227, 234; 393 NW2d 592 (1986).

The nature of the CSC II offenses was CSC against a minor. "Time is not of the essence, nor is it a material element, in criminal sexual conduct cases involving a child victim." *People v Dobek*, 274 Mich App 58, 83; 732 NW2d 546 (2007). This Court has generally recognized that children may have difficulty remembering the specific dates of abuse. *Naugle*, 152 Mich App at 235. Although the prosecutor never pinpointed, with either HB or KM, specific dates for the sexual touching, there is no indication on the record that the prosecutor did not undertake a

reasonably thorough investigation to determine more specific times for the abuse before defendant was charged. Under these circumstances, and especially because the nature of the charged offenses was CSC against minors, we conclude that the timeframes for the CSC II charges in either docket did not clearly and obviously deny defendant his right to adequate notice of the charges. *Carines*, 460 Mich at 763.

Defendant further claims that the lack of specificity regarding when the CSC II offenses occurred denied him his right to present a defense. Defendant has abandoned this argument. Likewise, defendant has abandoned the argument that, because the informations did not indicate which body part of HB and KM was alleged to have been touched for the CSC II charges, he was denied his right to due process. By only citing cases for the general propositions that a defendant has a constitutional right to present a defense and that a defendant has a due process right to know the nature and cause of the accusations against him, defendant has given the issues cursory treatment and left it to this Court to discover and rationalize the basis for the claims. *Kelly*, 231 Mich App at 640-641.

## C. UNANIMITY INSTRUCTION

Next, defendant argues that the trial court erred when it failed to give a special unanimity instruction regarding the CSC II offenses. Because defendant expressly approved the instructions, he waived this claim of instructional error. *Kowalski*, 489 Mich at 503; *Lueth*, 253 Mich App at 688. Further, the failure of the trial court to sua sponte give a special unanimity instruction did not prejudice defendant. *Carines*, 460 Mich at 763. KM testified that defendant sexually touched her more than 10 times; HB testified that defendant sexually touched her 7 times. This testimony showed that defendant had a course of conduct in touching his daughters' breasts and buttocks, as well as a propensity to engage in sexual acts with his daughters. *Id*. Further, defendant did not present separate defenses to the majority of the alleged touchings, but merely "denied the existence of any inappropriate behavior." See *Cooks*, 446 Mich at 503. Under these circumstances, the trial court's failure to give special unanimity instructions did not affect the outcome of trial.

## D. PROSECUTORIAL ERROR[9]

Defendant also argues that he was denied a fair trial by prosecutorial error. Because defendant did not raise his claims of prosecutorial error below, they are unpreserved. *Metamora Water Serv, Inc*, 276 Mich App at 382. We review unpreserved claims of prosecutorial error for

---

[9] Courts and litigants frequently have referred to claims such as that raised by defendant as "prosecutorial misconduct." This Court has recently stated that "the term 'misconduct' is more appropriately applied to those extreme . . . instances where a prosecutor's conduct violates the rules of professional conduct or constitutes illegal conduct," and concluded that claims "premised on the contention that the prosecutor made a technical or inadvertent error at trial" are "more fairly presented as claims of 'prosecutorial error.' "*People v Cooper*, __Mich App __; __NW2d __ (2015) (Docket No. 318159), slip op at 7 (citation omitted).

plain error affecting the defendant's substantial rights. *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003).

First, defendant claims that the prosecutor failed to disclose evidence of a plea agreement with Engman. Suppression by the prosecution of evidence favorable to the accused, which is material to either guilt or to punishment, violates due process. *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014). The prosecutor must disclose the contents of plea agreements with key government witnesses. *California v Trombetta*, 467 US 479, 485; 104 S Ct 2528; 81 L Ed 2d 413 (1984). There is, however, no record evidence of any agreement between the prosecutor's office and Engman. Defendant has, therefore, not established the factual predicate for this claim.

Second, defendant argues that the prosecutor committed error by introducing irrelevant and unfairly prejudicial evidence. Generally, relevant evidence is admissible, while irrelevant evidence is not admissible. MRE 402; *Benton*, 294 Mich App at 199. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Under this definition, evidence is relevant if it is helpful in throwing light upon any material point. *People v Murphy* (*On Remand*), 282 Mich App 571, 580; 766 NW2d 303 (2009). The credibility of a witness who is offering relevant testimony is always a material issue. *People v Mills*, 450 Mich 61, 72; 537 NW2d 909 (1995). Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403. "A finding of prosecutorial misconduct cannot be based on a prosecutor's good-faith effort to admit evidence." *People v Abraham*, 256 Mich App 265, 278; 662 NW2d 836 (2003).

Having reviewed the laundry list of evidence that defendant claims was irrelevant and unfairly prejudicial, we conclude only that the prosecutor erred in (1) eliciting testimony about earlier parties at defendant's house where underage people drank alcohol and smoked marijuana and (2) asking Aaron Stehle if he was aware that his sister had made allegations against defendant. But, as stated in Section III, evidence of the earlier parties did not affect defendant's substantial rights. *Id*. The prosecutor also erred in asking his question to Stehle because the question sought to place evidence before the jury that someone other than HB and KM had made "allegations" against defendant, which was not relevant to the instant case. The question had no impeachment value because Stehle only testified that he had never *seen* defendant inappropriately touch someone, which could be true even if Stehle did know that his sister had made allegations against defendant. However, because Stehle denied any awareness of allegations by his sister, the prosecutor's question did not affect defendant's substantial rights. *Id*. Although the prosecutor's question may have implied that Stehle's sister had made allegations against defendant, the jury was instructed that the questions of the attorneys were not evidence. Jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Defendant also challenges testimony from Kropewnicki about whether he discussed his and his wife's sexual activity with friends. The testimony was irrelevant. However, because the prosecutor never had the chance to explain why he asked Kropewnicki about this, and because the question itself did not prejudice defendant, we decline to find that the prosecutor's question amounted to plain error. *Ackerman*, 257 Mich App at 448. In addition, while we previously

concluded that evidence that pornography was found on defendant's computer was unfairly prejudicial, the prosecutor did not err in eliciting the evidence because, as it was probative to Engman's credibility, it was arguably admissible. See *Dobek*, 274 Mich App at 83.

The remaining challenged testimony was relevant. The evidence of other sexual acts by defendant against HB, and KM—the acts that did not constitute evidence of the actus reus of the charged crimes—was relevant because it showed defendant's propensity to commit the charged crimes and a pattern of conduct by defendant. MCL 768.27a; *Watkins*, 491 Mich at 470. Evidence about defendant engaging in threesomes and that defendant and Engman offered KM money to have a threesome with them was relevant. The evidence had a tendency to make a fact of consequence—that defendant penetrated KM's vagina while being aided by Engman—more probable. MRE 401.[10] Evidence about Engman and Farrant's visit to defendant's house to collect her belongings and Farrant's subsequent telephone conversation with KM, evidence that HB made disclosures during her second interview, evidence that Engman and KM were concerned about HB's safety at defendant's house, evidence that defendant prevented HB from seeing and speaking to her mother, evidence about KM's hardships growing up with her mother, and evidence about the steps the Children's Protective Services investigator took after HB's first interview was relevant. This evidence helped explained why, when, and how disclosures were made about defendant's abuse. As such, the evidence shed light on a material issue: the credibility of Engman, HB, and KM. *Murphy* (*On Remand*), 282 Mich App at 580. Kropewnicki's testimony that he would not want witnesses if he sexually touched children was relevant. It was offered to counteract the implication that defendant did not abuse HB and KM simply because Kropewnicki and other defense witnesses did not witness such abuse. MRE 401.[11]

None of the evidence mentioned in the above paragraph was unfairly prejudicial. Certainly, some of it, such as defendant's refusal to let Engman retrieve her personal belongings when she arrived at defendant's house with Farrant, defendant's offer to pay KM money to engage in a threesome, and defendant's act of punishing HB for speaking on the telephone with her mother, portrayed defendant in a bad light. However, all relevant evidence is prejudicial to some extent. *Murphy* (*On Remand*), 282 Mich App at 571. "Unfair prejudice exists when there is a tendency that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of it." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). There was no clear or obvious tendency that the evidence would be given undue or

---

[10] Defendant also argues that the prosecutor erred by telling the jury during his opening statement that it would hear testimony that defendant and Engman engaged in threesomes and that it was defendant's desire to have a threesome with Engman and KM The prosecutor committed no error in making this statement. Evidence about defendant engaging in threesomes was relevant, and the purpose of an opening statement is to tell the jury what the advocate proposed to show. *People v Moss*, 70 Mich App 18, 32; 245 NW2d 389 (1976).

[11] Even if Kropewnicki's testimony was irrelevant, this testimony amounted merely to a general statement of opinion and did not affect defendant's substantial rights. *Ackerman*, 257 Mich App at 448.

preemptive weight. *Carines*, 460 Mich at 763. There was no misconduct amounting to plain error by the prosecutor in eliciting the testimony. *Ackerman*, 257 Mich App at 448.

Defendant further argues on appeal that the prosecutor asked the jury to sympathize with HB and KM. A prosecutor may not appeal to the jury to sympathize with the victim. *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). The prosecutor's remark, during opening statement, that it would be hard for HB and KM to testify against defendant was a statement of the obvious. It would be "hard" and an "interesting experience" for any daughter to testify that her father, especially when the father is representing himself, sexually abused her. The remark was not a clear and obvious appeal to the jury to sympathize with HB and KM. *Carines*, 460 Mich at 763.

Similarly, the prosecutor did not err when he summarized in his opening statement the hardships that KM endured while living with her mother and when he elicited testimony from KM about those hardships. The purpose of an opening statement is to tell the jury what the advocate proposes to show. *People v Moss*, 70 Mich App 18, 32; 245 NW2d 389 (1976). By giving a summary of KM's expected testimony and by then eliciting testimony from KM about the difficulties she experienced while living with her mother, the prosecutor was not clearly and obviously asking the jury to sympathize with KM. *Carines*, 460 Mich at 763. KM's credibility was at issue and KM testified that, even though defendant started to touch her breasts and buttocks during her weekend visits with him, she continued to visit him. Her testimony about her "tough" life with her mother explains why she continued the visits.

Fourth, defendant argues that the prosecutor erred by asking witnesses to give an opinion on the credibility of HB and KM. According to defendant, the prosecutor did this when he asked Farrant about his impressions of his telephone conversation with KM and when he asked Officer Goff whether a "progression of details," such as HB made during her three interviews, was consistent with his experience. Because the credibility of the witnesses is to be determined by the jury, it is improper for the prosecutor to ask a witness to opine on the credibility of another witness. *Dobek*, 274 Mich App at 71. However, there was no improper opinion either elicited from or given by Farrant or Goff. The prosecutor did not ask either officer whether he believed HB or KM was credible, and neither officer testified that he believed either victim was telling the truth.

Likewise, there was nothing improper about the prosecutor's remark in closing argument that it was Goff's assessment that HB and KM were not coached, but that defendant "had a way of doing things." Goff had testified, in response to questions asked by defendant, that the stories given by HB and KM were "very very similar," but this did not shock him because he got the impression that touching by defendant was a "creature of habit thing." The prosecutor's remark was part of an argument that HB was credible. A prosecutor may argue from the facts that a witness is credible. *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997).

Defendant argues that the cumulative effect of the prosecutor's conduct denied him a fair trial. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. Only actual errors are aggregated to determine

their cumulative effect. *People v Rice (On Remand)*, 235 Mich App 429, 448; 597 NW2d 843 (1999). The prosecutor committed two errors: (1) when he elicited testimony about earlier parties at defendant's house where underage people drank alcohol and smoked marijuana and (2) when he asked Stehle whether he was aware that his sister had made allegations against defendant. These errors, when aggregated, do not undermine the reliability of the verdict, *Dobek*, 274 Mich App at 106, especially where the testimony of HB and KM, alongside Engman's testimony, showed that defendant had a propensity to engage in sexual acts with his daughters and that he had a pattern of conduct.

## E. LIFETIME ELECTRONIC MONITORING

Finally, defendant argues that the trial court erred when it imposed lifetime electronic monitoring on him for his CSC II conviction in Lower Court No. 12-010153-FC. According to defendant, because the jury never found beyond a reasonable doubt that he was over the age of 17 at the time of the sexual contact, the imposition denied him his constitutional right to jury. We review constitutional issues de novo. *Drohan*, 475 Mich at 146.

In *People v Brantley*, 296 Mich App 546, 558-559; 823 NW2d 290 (2012), after reading MCL 750.520n in conjunction with MCL 750.520b(2)(d) and MCL 750.520c(2), this Court stated when a trial court is required to impose lifetime electronic monitoring: (1) when a defendant who is 17 years old or older is convicted of CSC II against a victim who is less than 13 years old and (2) when a defendant is convicted of CSC I, regardless of the ages of the defendant and the victim. Accordingly, in Lower Court No. 12-010153-FC, because defendant was convicted of CSC I, the trial court was required to sentence him to lifetime electronic monitoring. There is no indication in the record that the trial court sentenced defendant to lifetime electronic monitoring for the CSC II conviction rather than the CSC I conviction. And it was in any event beyond question that defendant was 17 years old or older at the time of the offenses. We reject the argument that the trial court erred when it imposed lifetime electronic monitoring on defendant in Lower Court No. 12-010153-FC.

Affirmed.

/s/ Patrick M. Meter
/s/ David H. Sawyer
/s/ Mark T. Boonstra

-18-